UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>   Plaintiff,<br><br>  v.<br><br>WILLIAM GRAULICH, IV, *et al.*,<br><br>   Defendants. | Civ. No. 2:09-cv-04355 (WJM)<br><br>OPINION |

**WILLIAM J. MARTINI, U.S.D.J.:**

  The Securities and Exchange Commission ("SEC") brings this action against William Graulich, IV ("Gaulich") and iVest International Holdings, Inc. ("iVest") (collectively "Defendants"), alleging that Defendants violated Section 17(a) of the Securities Act of 1933, 15 U.S.C. §77q(a) ("Section 17(a)"), Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ("Section 10(b)"), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5 ("Rule 10b-5") (the Securities Act of 1933 and the Securities Exchange Act of 1934 are collectively referred to as the "Securities Acts"). This matter comes before the Court on the SEC's motion for summary judgment under Federal Rule of Civil Procedure 56. There was no oral argument on the motion. Fed. R. Civ. P. 78(b). For the reasons set forth below, the SEC's motion for summary judgment is **GRANTED**.

 **I. BACKGROUND**

  The following facts are set forth by the SEC. Graulich was a resident of Henryville, Pennsylvania. Declaration of Kingdon Kase ("Kase Decl.") Ex. 1, p. 23, ECF No. 68-1. iVest was a Delaware corporation that Graulich established in February 2000. Declaration of Cormac Logue ("Logue Decl.") ¶ 7 and Ex. 3, ECF No. 69. Graulich operated iVest from his home in Henryville. Logue Decl. ¶ 7.

  Starting no later than October 2006, Defendants began perpetrating a "prime bank" or "high yield investment" scheme that eventually raised $13 million from at least five investors. Logue Decl. ¶ 8. Defendants used intermediaries to solicit high net worth

1

individuals to invest with them. *See* Declaration of Daphne Gordon ("Gordon Decl.") ¶¶ 7-9, ECF No. 70. Defendants told investors that their funds would be used as collateral so that Defendants could invest in trading programs that would generate guaranteed weekly returns of 22% to 140% per week. Gordon Decl. ¶¶ 13-17; Gordon Ex. B; Logue Decl. ¶¶ 8, 19; Logue Exs. 9, 10. Defendants told investors that they would generate those profits by trading in "fully negotiable bank instruments," such as "medium term notes" and "standby letters of credit." Gordon Ex. A. Defendants told investors that their "funds are ***not at risk***." *Id.* (emphasis in original). Defendants also represented to investors that their funds would be deposited in an escrow or trust account, and would not be removed without the investor's permission. Gordon Decl. ¶¶ 13, 14. Graulich told one investor that he was licensed and authorized by the SEC, when, in fact, he has never been registered with the SEC in any capacity. Logue Decl. ¶ 6; Gordon Decl. ¶ 14. Graulich also told investors that "[d]iscretion is paramount", and they were required to sign a "strict Non-Disclosure, Non-Circumvention agreement" in order to prevent "unknown outsiders" from learning of his "financial dealings." Gordon Ex. A.

Daphne Gordon, a citizen of the United Kingdom who resides in Belgium, was one of the investors in iVest. Gordon Decl. ¶ 1. Gordon was approached by an intermediary who invited her to invest in a "private placement program" managed by Graulich and iVest. *Id.* ¶ 7. Gordon was told that the private placement program would generate enormous profits with no risk. *Id.* ¶ 8. On August 5, 2008, Gordon was shown a PowerPoint presentation about the private placement program that included the following representations:

- The program was a secretive investment program historically available only to ultra-wealthy investors with $100 million or more to invest;
- Because the program was so lucrative, participation was "by invitation only";
- The program was completely safe: "Funds [were] held in a non-depletion attorney account" and used only as collateral for the transactions; and
- The program paid extraordinary returns with "guaranteed profit/yield from each trade" and "guaranteed weekly payments to investors."

*Id.* ¶ 10. After viewing the PowerPoint presentation, Gordon signed a joint venture agreement with Graulich and iVest whereby she agreed to invest $5 million. Gordon Ex. B. As required by the agreement, Gordon wired her investment to an iVest account at JP Morgan Chase Bank, N.A. ("Chase") in Morristown, New Jersey. Gordon Decl. ¶ 25. In total, Gordon invested approximately $4.5 million with Graulich and iVest. *Id.* ¶¶ 21, 25. The four other investors made similar investments with Defendants.

Instead of using the investors' funds in a trading program, Graulich used the funds for his own personal benefit. Graulich used investor proceeds to purchase expensive automobiles such as a Jaguar and a Chevrolet, to purchase New York Yankees tickets costing more than $100,000, to pay legal expenses totaling at least $125,000, to pay back

taxes of approximately $126,000, and to pay other day to day personal expenses. Kase Decl. Ex. 1, pp. 26-27, 34-35; Logue Decl. ¶ 23. Graulich also used investor funds to pay investors what he told them were trading profits, even though the funds he sent to them were actually from their original investments or the investments of others. Kase Decl. Ex. 1, p. 34; Logue Decl. ¶ 23. There is no evidence that Graulich ever traded any securities or bank instruments of any kind on behalf of iVest's investors. Logue Decl. ¶ 23.

According to Professor James E. Byrne, the SEC's expert, the investments purportedly sold by Graulich are a common type of international financial scam known as a "Prime Bank" or "High Yield" Investment Scam. Declaration of James E. Byrne ("Byrne Decl.") ¶ 27, ECF No. 71. Professor Byrne explained that the risk-free returns promised by Graulich do not exist in legitimate finance. Byrne Decl. ¶¶ 15, 22-23. The "fully negotiable bank instruments" that Graulich claimed he would be trading do not exist. Byrne Decl. ¶ 26. And the proposed return of 22% per week (or approximately 1040% per year) is so high as to make it "ridiculous." Byrne Decl. ¶ 22. Professor Byrne opined that the "fraudulent character of the scheme contained in the Gaulich/iVest materials is so patent that any person who holds themselves out as being knowledgeable about such programs and their legitimacy is either deliberately making a fraudulent statement or is acting recklessly in disregard of its patently fraudulent character." Byrne Decl. ¶ 43.

The SEC filed this civil enforcement action on August 26, 2009. ECF No. 1. That same day, the Honorable Joseph A. Greenaway issued a temporary restraining order enjoining Defendants from violating Section 17(a), Section 10(b), and Rule 10b-5, and freezing Defendants' assets, including approximately $1.2 million held in iVest's Chase account. ECF No. 7. On November 6, 2009, Judge Greenaway entered an order preliminarily enjoining Defendants from the same violations. ECF No. 23.

Graulich was subsequently charged in a parallel criminal case brought by the United States Attorney's Office for the District of New Jersey with conspiracy to commit wire fraud based upon the fraudulent representations made to Daphne Gordon. On September 23, 2011, Graulich pled guilty to one count of conspiracy to commit wire fraud. During his plea colloquy, Graulich admitted that: (1) he "agree[d] with others to defraud investors by making material false and fraudulent promises and representations to those investors"; that (2) "those false and fraudulent promises include[d] promises about how [he] would handle the investor's money and the amount of returns this money could generate"; and that (3) from his home in Pennsylvania, he made telephone calls, sent emails, and ordered wire transfers at a bank in New Jersey in furtherance of the fraud. Kase Decl. Ex. 1, pp. 23-26.

On March 12, 2012, Graulich informed the Government that he was moving to withdraw his guilty plea. At a hearing in April 2012, the District Court denied Graulich's motion to withdraw his guilty plea. On May 17, 2012, judgment was entered against

Graulich, and Graulich was sentenced to 70 months imprisonment and ordered to pay restitution in the amount of $3,602,852.71. *United States v. Graulich*, No. 1:11-cr-641 (D.N.J. Nov. 19, 2010), ECF No. 31. Graulich appealed the District Court's order denying his motion to withdraw his guilty plea. On April 18, 2013, the Third Circuit affirmed the District Court order. *United States v. Graulich*, No. 12-2576, 2013 WL 1668330, at *2-3 (3d Cir. Apr. 18, 2013).

The SEC now moves for summary judgment in this parallel civil action.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides for summary judgment "if the pleadings, the discovery [including, depositions, answers to interrogatories, and admissions on file] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court considers all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. *Andreoli v. Gates*, 482 F.2d 641, 647 (3d Cir. 2007).

## III. DISCUSSION

The Court finds that there are no genuine issues as to any material facts, that Defendants are liable for the misconduct alleged, and that final judgment should be entered against Defendants.

### A. There Are No Genuine Issues as to Any Material Facts

The Court finds that none of the material facts are in dispute for two reasons.

First, Graulich is collaterally estopped from challenging most of the facts giving rise to civil liability because he pled guilty to criminal fraud charges stemming from the same conduct. Under the doctrine of collateral estoppel, "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Montana v. United States*, 440 U.S. 147, 153-54 (1979). The Third Circuit recently held that, where "a conviction is the result of a guilty plea, its preclusive effect extends to all issues that are necessarily admitted in the plea." *Anderson v. C.I.R.*, 698 F.3d 160, 164 (3d Cir. 2012). In his criminal action, Graulich pled guilty to defrauding the primary victim identified in this case.[1] The Third Circuit has denied

---

[1] This civil action also involves similar conduct affecting four additional investors.

Graulich's request to withdraw that guilty plea. *Graulich*, 2013 WL 1668330, at *2-3. Thus, Graulich is estopped from denying all of the issues that were necessarily admitted in the plea.

Second, the remaining facts are undisputed because Defendants did not provide any evidence contradicting the evidence presented by the SEC. The SEC's motion is supported by an abundance of evidence, including copies of the PowerPoint presentation used to defraud investors, copies of the fraudulent joint venture agreement, email and letter correspondence between Defendants and the victims, a thorough victim affidavit, and a thorough expert report. These documents clearly establish the facts as set forth above. Defendants do not challenge the SEC's expert report or any of the other evidence submitted by the SEC. And Defendants provided absolutely no evidence whatsoever in support of their opposition. In their opposition brief, Defendants assert, for the first time, that (1) Graulich was acting on the advice of counsel, and that (2) Graulich himself was "swindled" out of the money he took from investors. Opp. Br. at 16, ECF No. 73. However, unsworn statements of counsel made in the briefs do not constitute evidence, and certainly do not raise an issue of fact in the face of a well-supported motion for summary judgment. *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990) ("unsworn statements of counsel in memoranda submitted to the court are even less effective in meeting the requirements of Rule 56(e) than are unsupported allegations in the pleadings").

Accordingly, the Court finds that there are no genuine issues as to any material facts.

## B. Defendants are Liable for the Misconduct Alleged

The facts clearly establish that both Defendants are liable for violating Section 17(a), Section 10(b), and Rule 10b-5.

Section 17(a), Section 10(b), and Rule 10b-5 prohibit the employment of fraudulent devices in connection with the offer, purchase, or sale of securities. To establish violations of Section 10(b) and Rule 10b-5, the SEC must show that Defendants (1) used the mails or an instrumentality of interstate commerce, (2) to make a material misrepresentation or a material omission or to use a fraudulent device, (3) in connection with the purchase or sale of securities, (4) with scienter. *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir. 1997); *S.E.C. v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999). Section 17(a) requires a showing of the same elements, except that claims under Section 17(a) may be premised on "offers" of securities as well as completed sales. *See* 15 U.S.C. § 77q; *S.E.C. v. Saltzman*, 127 F. Supp. 2d 660, 665 (E.D. Pa. 2000). All four elements have been clearly established in this case.

5

First, Defendants used the mails and other instrumentalities of interstate commerce. Graulich admitted during his plea colloquy that, from his home in Pennsylvania, he made telephone calls, sent emails, and ordered wire transfers at a bank in New Jersey, in furtherance of his fraud. *See Richter v. Achs*, 962 F. Supp. 31, 33 (S.D.N.Y. 1997) ("[I]f a single telephone is used to call the defendants to a meeting at which they engage in fraudulent activity, the jurisdictional element is satisfied").

Second, Defendants made material misrepresentations and material omissions. The SEC provided an abundance of evidence demonstrating that Defendants made false statements concerning the very existence of the securities they purported to trade in, the financial returns that investors could expect, the risk investors were exposed to, and how investor funds would be used. *See, e.g.*, Gordon Decl. ¶¶ 13-17; Gordon Ex. B; Logue Decl. ¶¶ 8, 19; Logue Exs. 9, 10. These misrepresentations were obviously material. *See S.E.C. v. Gallard*, No. 95-3099, 1997 WL 767570, at *3 (S.D.N.Y. Dec. 10, 1997) ("there is no question a reasonable investor would consider important the fact that the 'security' at issue did not exist"); *S.E.C. v. Lauer*, 52 F.3d 667, 669 (7th Cir. 1995) (the sale of prime bank instruments is "thoroughgoing, pure, and barefaced" fraud).

Third, Defendants' misrepresentations were made in connection with the offer, purchase, and sale of securities. The investments offered by Defendants were securities because their trading program purportedly involved the purchase and sale of fully negotiable "prime bank" instruments, including "medium term notes." Logue Decl. ¶ 8; Gordon Ex. A; *SEC v. Bremont*, 954 F. Supp. 726, 732 (S.D.N.Y. 1997) ("[prime bank instruments], if they existed, would be securities"). The securities laws still apply even though the securities at issue were a sham. *See Gallard*, 1997 WL 767570, at *3 ("It is clear by now that the antifraud provisions relied upon by the [SEC] are applicable even where, as here, the 'security' at issue does not exist"); *Lauer*, 52 F.3d at 670 ("It would be a considerable paradox if the worse the securities fraud, the less applicable the securities laws").

Fourth, Defendants acted with scienter. Scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). During his plea colloquy, Graulich acknowledged that he "agreed with others to defraud investors by making material false and fraudulent promises and representations to those investors." Kase Decl. Ex. 1, p. 23. Further, the SEC's expert opined that the "fraudulent character of the scheme contained in the Gaulick/iVest materials is so patent that any person who holds themselves out as being knowledgeable about such programs and their legitimacy is either deliberately making a fraudulent statement or is acting recklessly in disregard of its patently fraudulent character." Byrne Decl. ¶ 43. Thus, the SEC demonstrated that Graulich acted with the requisite intent. Graulich's scienter is imputed to iVest because Graulich had complete control over iVest and used iVest to operate the fraud. *See S.E.C. v. Mgmt. Dynamics,*

6

*Inc.*, 515 F.2d 801, 812 (2d Cir. 1975) (scienter of an individual who controls a business entity may be imputed to that entity).

Citing the Supreme Court case *Morrison v. Nat'l Australia Bank Ltd.*, 130 S. Ct. 2869 (2010), Defendants argue that they are not liable for the fraud committed on Daphne Gordon because the Securities Act of 1934 does not apply extraterritorially. The Court disagrees. In *Morrison*, the Supreme Court considered the narrow issue of "whether § 10(b) of the Securities Exchange Act of 1934 provides a cause of action to foreign plaintiffs suing foreign and American defendants for misconduct in connection with securities traded on foreign exchanges." *Id.* at 2875. The Supreme Court held that the relevant inquiry is "whether the purchase or sale is made in the United States, or involves a security listed on a domestic exchange." *Id.* at 2886. Unlike in *Morrison*, the Defendants' scheme purportedly involved the trading of U.S. financial instruments backed by major U.S. banks. Further, Defendants were domiciled in the United States, solicited investors from the United States, executed fraudulent investment agreements in the United States, and consummated every sale in the United States by receiving investor funds in iVest's New Jersey bank accounts.

Accordingly, the undisputed facts establish that Defendants violated Section 17(a), Section 10(b), and Rule 10b-5.

### C. Relief

The SEC seeks final judgments permanently enjoining Defendants from committing future violations of the antifraud provisions, requesting disgorgement of their illicit profits plus prejudgment interest, and civil penalties. The Court finds that injunctive relief, disgorgement, and civil penalties are all appropriate in this case.

#### i. Injunctive Relief

Section 20(b) of the Securities Act of 1933 and Section 21(d)(1) of the Securities Exchange Act of 1934 authorize the SEC to seek injunctive relief when a person or entity "is engaged or is about to engage" in conduct constituting a violation of the Acts. 15 U.S.C. § 77t; 15 U.S.C. § 78u. To obtain an injunction, the SEC must establish that "there is a reasonable likelihood that the defendant, if not enjoined, will again engage in the illegal conduct." *SEC v. Bonastia*, 614 F.2d 908, 912 (3d Cir. 1980). To determine the likelihood of future violations, courts evaluate "the totality of the circumstances surrounding the particular defendant and the past violations that were committed." *Id.* In this case, a permanent injunction is warranted. Defendants' conduct was egregious, deliberate, and continued for years. Given the highly profitable nature of Defendants' fraud, and Graulich's lack of willingness to take responsibility for his actions at his own sentencing, there is every reason to believe that he would repeat his violations again unless enjoined.

### ii. Disgorgement

Courts have the authority to order disgorgement of ill-gotten gains in an SEC enforcement action. *See SEC v. Hughes Capital Corp.*, 124 F.3d 449, 455 (3d Cir.1997); *SEC v. Chiase*, No. 10-5110 (WJM), 2011 WL 6176209, at *3 (D.N.J. Dec. 12, 2011). Disgorgement is an equitable remedy by nature, and the district court is therefore invested with broad discretion in fashioning an appropriate disgorgement order. *SEC v. Hughes Capital Corp.*, 917 F. Supp. 1080, 1085 (D.N.J. 1996), *aff'd*, 124 F.3d 449 (3d Cir. 1997). Defendants argue that the disgorgement amount should be offset by $2.5 million because Defendants were "swindle[d]" out of this money by an unidentified individual in New Mexico. Opp. Br. at 2, 17. However, Defendants provide no evidence whatsoever that this transaction took place. And, in any event, the fact that Defendants were subsequently scammed out of their own illegal profits is not a compelling reason to reduce the amount of disgorgement.

Accordingly, the Court will order Defendants to disgorge illegal profits of $5,592,102, which is the amount of money raised by iVest and Graulich through their fraud minus the amount received back by investors. *See* Logue Decl. ¶ 31. Defendants are also ordered to pay prejudgment interest on the illegal profits at the "Internal Revenue Service underpayment rate." *Chiase*, 2011 WL 6176209, at *5; *see also* 26 U.S.C. § 6621(a)(2). Using the rate that the Internal Revenue Service uses for tax underpayments, compounded quarterly, Defendants are ordered to pay prejudgment interest in the amount of $1,879,589. *See* Logue Decl. ¶ 31.

### iii. Civil Penalties

Section 20(d) of the Securities Act of 1933 and Section 21(d)(3) of the Securities Exchange Act of 1934 provide that the SEC may seek monetary civil penalties for violations of those Acts. 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3). In this case, the SEC seeks the imposition of a maximum third-tier penalty. Third-tier penalties apply to violations of the Securities Acts that (1) involve "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement"; and (2) "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. § 77t(d)(2)(C); 15 U.S.C. § 78u(d)(3)(B)(iii). The Court finds that third-tier penalties are warranted in this case because Defendants' conduct (1) involved fraud, deceit, and manipulation; and (2) resulted in millions of dollars in losses to other persons. In addition, the evidence reflects that Defendants acted with a high degree of scienter, engaged in repetitive fraud, made substantial profits, and failed to take responsibility for their actions.

When imposing third-tier penalties, a court can award a penalty for each violation of the Securities Acts or the court can award a single penalty for the "gross amount of pecuniary gain." 15 U.S.C. § 77t(d)(2)(C); 15 U.S.C. § 78u(d)(3)(B)(iii). With regard to gross pecuniary gain, many courts have imposed a single penalty equal to the amount of

disgorgement. *See, e.g.*, *SEC v. Yuen*, 272 Fed. App'x 615, 618 (9th Cir. 2008) (affirming a district court's penalty equal to the disgorgement amount as "well within [the district court's] discretion"); *SEC v. Invest Better 2001*, No. 11427, 2005 WL 2385452, *5 (S.D.N.Y. May 4, 2005) (ordering civil penalty equal to disgorgement amount because "the exact number of violations . . . is impossible to determine"). The Court finds that such an approach is appropriate here, as the exact number of violations would be difficult or impossible to determine. Accordingly, Defendants are ordered to pay a civil penalty in the amount of $5,592,102. *See SEC v. CMKM Diamonds, Inc.*, 635 F. Supp. 2d 1185, 1194 (D. Nev. 2009) (awarding the amount of disgorgement, before interest, as a civil penalty).

## IV. CONCLUSION

For the reasons stated above, the SEC's motion for summary judgment is **GRANTED**, and judgment is entered against Graulich and iVest. An appropriate order follows.

/s/ William J. Martini
**WILLIAM J. MARTINI, U.S.D.J.**

**Date: June 19, 2013**